IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

WACO DIVISION

| | | |
|---|---|---|
| SIERRA CLUB,<br>    Plaintiff | § § § | |
| v. | § § | Civil Action No. W-12-CV-108 |
| ENERGY FUTURE HOLDINGS<br>CORPORATION and LUMINANT<br>GENERATION COMPANY LLC.,<br>    Defendants. | § § § § § | |

## ORDER

Before the Court is Plaintiff's Motion for Partial Summary Judgment. Having reviewed the motion, response, reply, and applicable law, the Court will defer deciding the standing issue and **DENY** Plaintiff's motion for partial summary judgment on liability.

### I.     Factual and Procedural Background

Defendants own and operate a coal-fired electric generating plant, located in Freestone County, Texas, known as "Big Brown Plant." The plant's two units generate electricity with a blend of coal. The electricity generated is supplied to 23 million Texas customers via the electric grid operated by the Electric Reliability Council of Texas ("ERCOT").

Big Brown Plant is required to operate under a permitting process that limits the amount of pollutants the plant may legally emit into the air. One measurement of air pollutants is opacity. Opacity is an indicator of the excessive

1

levels of particulate matter pollution being emitted by a facility.   Essentially, opacity measures the level of soot in the facility's exhaust.   Texas rules define opacity as the "degree to which an emission of air contaminants obstruct the transmission of light expressed as a percentage of light obstructed as measured by an optical instrument or trained observer." 30 TEX. ADMIN. CODE § 101.1(72). In other words, the higher the opacity, the less light that passes through a plume of air pollution.

The Clean Air Act ("CAA") requires that each state submit a State Implementation Plan ("SIP") to the Environmental Protection Agency ("EPA") for approval. *See* 42 U.S.C. § 7210.  Under the Texas SIP, power plant opacity "shall not exceed 30 percent averaged over a six-minute period." 30 TEX. ADMIN CODE § 111.111(a)(1)(A).[1]  Big Brown's Title V permit, however, incorporates a stricter standard.  Under Big Brown's Title V permit, there is a 20 percent opacity limit.   Additionally, emissions may not exceed "0.3 pound of total suspended particulate per million [British thermal units ("Btu")] heat input, averaged over a two-hour period."[2] 30 TEX. ADMIN CODE § 111.153(b).

Plaintiff asserts that according to Defendants' self-reported data, Big Brown Plant violated the 30 percent opacity limit on 6,520 occasions between July 2007 and December 2010 in violation of the Texas SIP, the Defendants' Title V permit, and the Clean Air Act.  Plaintiff states the violations at times

[1] The opacity limit has been approved by the EPA. *See* 40 C.F.R. § 52.2270(c); 61 Fed. Reg. 20,732, 20,734 (May 1996) (approving the 30 percent opacity limit into the Texas SIP).
[2] EPA approved this standard as an applicable requirement of the Texas SIP. 74 Fed. Reg. 19,144 (Apr. 28, 2009) (approving 30 TEX. ADMIN. CODE § 111.153(b) into the Texas SIP).

exceeded 90 percent opacity.   Furthermore, Plaintiff alleges Big Brown Plant violated the particulate matter ("PM") limits outlined in the Texas SIP and Big Brown's Title V permit.   Plaintiff states that using the Defendants' self-reported heat input and sulfur dioxide emissions data the Defendants have violated the PM limit on at least 370 occasions between January 2008 and July 2011.

Defendants moved to dismiss the case pursuant to Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.   The Court partially granted and partially denied Defendants' motion.   Then, Plaintiff filed an Amended Complaint. Now, Plaintiff moves for partial summary judgment on the issues of standing and liability.

## II.    Standard of Review

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   The movant is entitled to summary judgment if, after an adequate time for discovery, the non-movant fails to make a sufficient showing on an essential element of his case with respect to which he bears the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   The movant must initially demonstrate the lack of evidence supporting the non-movant's case.   *See id.* at 323.   The burden then shifts to the non-movant to present some evidence showing that there is a genuine issue for trial.   *See id.* at 324.

A genuine issue for trial exists if "the evidence is such that a reasonable jury could return a verdict for the non-movant."   *See Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986).  Because that issue cannot be resolved without reference to "the criteria governing what evidence would enable the jury to find for [the non-movant]," the Court "must view the evidence presented through the prism of the substantive evidentiary burden."  *See id.* at 254.  However, in making this determination, the Court may not weigh the evidence or evaluate the credibility of the witnesses.  *See id.* at 255.  Instead, it must view all facts in the light most favorable to the non-movant and make all justifiable inferences in her favor. *See id.*

### III.   Analysis

#### A. Standing

The Court declines to issue summary judgment on this issue of standing at this time.  Defendants have requested a Rule 56(d) continuance in response to Plaintiff's Partial Motion for Summary Judgment.  Rule 56(d) authorizes a court to grant a continuance when the non-movant has not had an opportunity to conduct discovery that is essential to his opposition to a motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 n. 5 (1986).  "Rule 56[d] motions are generally favored and should be liberally granted." *Beattie v. Madison County Sch. Dist.,* 254 F.3d 595, 606 (5th Cir. 2001).

To comply with the Rule, the party opposing summary judgment must show (1) why he needs additional discovery and (2) how that discovery will create a genuine issue of material fact. *Stearns Airport Equip. Co. v. FMC Corp.,* 170 F.3d 518, 535 (5th Cir. 1999).  Although the burden is not a heavy one, the

4

non-movant must justify his entitlement to a continuance by presenting specific facts explaining his inability to make a substantive response. *Union City Barge Line, Inc. v. Union Carbide Corp.,* 823 F.2d 129, 137 (5th Cir. 1987) (*citing SEC v. Spence & Green Chem. Co.,* 612 F.2d 896, 901 (5th Cir. 1980)).  Finally, in conjunction with a non-movant's request for additional discovery, the non-movant must establish that he has diligently pursued relevant discovery. *See Beattie,* 254 F.3d at 606 (refusing Rule 56[d] continuance because non-movant was not diligent in conducting discovery); *Int'l Shortstop, Inc. v. Rally's, Inc.,* 989 F.2d 1257, 1267 (5th Cir. 1991) (holding court need not accommodate request for continuance when non-movant has not diligently pursued the discovery of necessary evidence).

The Court is persuaded that a continuance is appropriate in this case in order to allow time for Defendants to complete discovery.  Therefore, the Court will defer considering the standing issue and will grant Defendants leave until September 20th, 2013 to file a supplemental response.  Also, the Court will grant the Plaintiff leave to file a supplemental reply to be filed seven days after Defendants file their supplemental response.

*B. Liability*

Plaintiff also seeks summary judgment on the issue of liability. Plaintiff asserts Defendants have violated the 30 percent opacity limit under 30 Texas Administrative Code § 111.111(a)(1)(A); 61 Fed. Reg. 20,734 (May 8, 1996) (approving Tex. Admin. Code § 111.111(a)(1)(A) into the Texas SIP) and the 20

percent opacity limit under Big Brown's Title V permit.   "When a party moves for summary judgment of the issue of liability, the non-movant is thereby placed on notice that *all* arguments and evidence opposing a finding of liability must be presented to properly resolve that issue." *Pantry, Inc. v. Stop-N-Go Foods, Inc.*, 796 F. Supp. 1164, 1167 (S.D. Ind. 1992).   "Whether a defense counters directly the elements of a claim or otherwise excuses liability (i.e. an affirmative defense), it must be presented and supported when embracing the issue of 'liability' is considered for judgment." *Id.*   Therefore, the Court must consider the affirmative defenses raised by Defendants to determine if summary judgment on liability can be issued against Defendants.

In this case, Defendants raise two separate affirmative defenses in opposition to summary judgment in their response.   Defendants argue summary judgment is not appropriate because all "6,520 occasions" are not violations under the affirmative defenses in § 101.222(d) & (e), which provide:

> (d) Excess opacity events due to an upset that are subject to § 101.201(e) of this title, or for other opacity events where there was no emissions event, are subject to an affirmative defense to all claims in enforcement actions for these events, other than claims for administrative technical orders and actions for injunctive relief, for which the owner or operator proves all of the following [elements]
>
> * * *
>
> (e) Opacity events resulting from unplanned maintenance, startup, or shutdown activity. Excess opacity events, or other opacity events where there was no emissions event, that result from an unplanned maintenance, startup, or shutdown activity that are determined not to be excessive are subject to an affirmative defense to all claims in enforcement actions brought for these activities, other than claims for administrative technical orders and actions for injunctive relief, for

which the owner or operator proves the opacity resulted from an unplanned maintenance, startup, or shutdown activity, as defined in § 101.1 of this title, and all of the following [elements].

30 Tex. Admin. Code § 101.222(d) & (e).[3]

The Court must first determine whether these defenses are even available to Defendants.  Plaintiff argues these defenses were incorporated into the Texas SIP *after* the alleged illegal emissions occurred, and therefore, they should not be applied to this suit.  Defendants argue the affirmative defenses should be applied because they were incorporated into Big Brown's Title V permit, even though the EPA had not yet incorporated the affirmative defenses into the Texas SIP.  Also, Defendants argue the Court must apply the current law, not the law in place at the time of the alleged transgressions.

The Court agrees with the Plaintiff that the affirmative defenses in this case were not incorporated into the Texas SIP until 2011, well after the alleged violations occurred.   However, the affirmative defenses in this case are still applicable for two reasons.   First, as Defendants suggest, the affirmative defenses were included in Big Brown's Title V permit, and the Court lacks jurisdiction to hear claims collaterally attacking the contents of those Title V permits.  Second, as Defendants also suggest, the Court is required to apply the current law, not the law at the time of the alleged violations.

---

[3] The EPA explained these affirmative defenses exist because "despite good practices, [sources may] be unable to meet emission limitations during periods of startup and shutdown and, that despite good operating practices, sources may suffer a malfunction due to events beyond the control of the owner or operator." *See Luminant Generation Co. LLC v. U.S. E.P.A.*, 714 F.3d 841, 849 (2013) (quoting 75 Fed. Reg. 68,991).

1) Incorporation into the Texas SIP

Sierra Club contends the affirmative defenses in § 101.222(d) & (e) cannot be applied in this case because they were not effectively incorporated into the Texas SIP until 2011.  The Court agrees that the affirmative defenses were not incorporated into the Texas SIP until 2011, but for the reasons stated by the Defendants, the affirmative defenses are applicable to this case.

i.      Regulatory Background

The Clean Air Act is a "comprehensive national program that ma[kes] the States and the Federal Government partners in the struggle against air pollution." *General Motors v. United States*, 496 U.S. 530, 532 (1990).  The States implement the CAA's permitting requirements through a State Implementation Plan.  The CAA mandates that each state prepare a SIP that meets the requirements of the Act. *See* 42 U.S.C. § 7410(a).  Each state is required to submit its SIP to the EPA for approval. *Id.*  Upon approval of a SIP, it has the force and effect of federal law and can be enforced by the state, EPA, and the public. 42 U.S.C. §§ 7413 & 7604.  "If a state wants to add, delete, or otherwise modify any SIP provision, it must submit the proposed change to EPA for approval." *Sierra Club v. Tenn. Valley Auth.*, 430 F.3d 1337, 1346 (11th Cir. 2005).  The law is clear that a state cannot amend its SIP for purposes of federal law "unless and until the EPA approve[s] any changes." *Safe Air for Everyone v. Envtl. Prot. Agency*, 488 F.3d 1088, 1097 (9th Cir. 2007).  Thus, "[t]here can be little or no doubt that the existing SIP [not the proposed SIP] remains the

8

'applicable implementation plan' even after the State has submitted a proposed revision." *General Motors*, 496 U.S. at 532.

ii.   The Affirmative Defenses Were Incorporated in 2011

On July 15, 2005, the TCEQ proposed the adoption of the current version of § 101.222(a)–(g) into the Texas SIP.  30 Tex. Reg. 4,090 (July 15, 2005).  The TCEQ finalized its proposed revision of § 101.222(a)–(g) on December 30, 2005, providing an effective date of January 5, 2006. 30 Tex. Reg. 8,884; 8,947 (Dec. 30, 2005).  Then, the TCEQ submitted the revised version of § 101.222 to the EPA on January 23, 2006.  Doc. 86-4 at 2.  On March 23, 2006, the EPA determined the TCEQ's submission was complete.  Over four years later, the EPA approved § 101.222(a)–(g).  The EPA stated the approval would be effective on January 10, 2011. 75 Fed. Reg. 68,989.  Because the affirmative defenses in § 101.222(d) & (e) were not approved by the EPA until January 10, 2011, they could not have been incorporated into the Texas SIP until then. *See General Motors*, 496 U.S. at 532.  This means the affirmative defenses in this case were incorporated into the Texas SIP after the time of the alleged misconduct.

2) Title V Permit

The Court's analysis, however, does not stop in determining *when* the affirmative defenses became part of the Texas SIP.  There are other important aspects to the statutory and regulatory scheme the Court must analyze.  The

Defendants ask the Court to consider Big Brown's Title V permit because the permit included the affirmative defenses. Defendants argue they may rely on the permit, even though the EPA had not yet incorporated the defenses into the Texas SIP. The Court agrees. Because the Court lacks subject matter jurisdiction to question the contents of the Title V permit, it cannot find liability for conduct that is permissible under Big Brown's Title V permit.

i.   Title V Background

Title V of the Clean Air Act, 42 U.S.C. §§ 7661–7661f, establishes an operating permit program for major sources of air contaminants. Under the CAA, "[I]t shall be unlawful for any person to violate any requirement of a permit issued under this subchapter, or to operate [a regulated source] ... except in compliance with a permit issued by a permitting authority under this subchapter." 42 U.S.C. § 7661a(a). A Title V permit *compiles* all the various applicable requirements for a facility into a single federally-enforceable air pollution permit. *See United States v. Cemex, Inc.*, 864 F. Supp. 2d 1040, 1045 (D. Colo. 2012) (emphasis added); 42 U.S.C. §§ 7661c(a),(b). The permit is crucial to the implementation of the Act: it contains, in a single, comprehensive set of documents, all CAA requirements relevant to the particular polluting source. *Com. of Va. v. Browner*, 80 F.3d 869, 873 (4th Cir. 1996). A Title V permit has been described as a "source-specific bible for Clean Air Act compliance." *Virginia v. Browner*, 80 F.3d 869, 873 (4th Cir. 1996). "Similar to other CAA programs, Title V permits are issued by the state permitting authority, but are subject to EPA review and veto." *Sierra Club v.*

*Otter Tail Power Co.*, 615 F.3d 1008, 1012 (8th Cir. 2010) (citations omitted). Compliance with a "Title V permit assure[s] compliance with all emission limitations and other substantive CAA requirements that apply to the source." *Id.*

There are two significant limitations on a party seeking to find a defendant liable for violating the terms of the permit.  First, there is no liability if the defendant is protected by a "permit shield."  Second, courts lack subject matter jurisdiction under the CAA if a party seeks to challenge the terms of the permit itself.  The Court must consider both limits in this case.

ii.     Permit Shield

"The Title V shield provision provides a significant benefit to the regulated community by providing certainty with respect to CAA compliance." John Cabell Acree, III, *Operational Flexibility under the Clean Air Act Title V Operating Permits*, 3 Envtl. Law 37, 64 (1996).  "That is, if a source conforms to the terms of its permit, it cannot be found in violation of any CAA requirement covered by the permit." *Id.*

However, the existence of a permit shield is not automatic. *See* 40 C.F.R. § 122.5(a)(1)("the permit may also provide that compliance with the permit shall be deemed compliance with other applicable provisions of this chapter that relate to the permittee. . . .").  In fact, under the Texas Administrative Code, "Any permit that does not expressly state that a permit shield exists shall not provide a permit shield." 30 TAC § 122.148(d).    In this case, Big Brown's permits do not "expressly state that a permit shield exists."  Therefore, there is no permit shield.

iii.   Jurisdictional Bar

The Title V regulatory scheme also contains a jurisdictional bar, which is applicable in this case.  To understand the scope of the jurisdictional bar, it is first necessary to understand the background on the permitting process.   Title V requires that state permitting authorities submit permit applications and proposed permits to the EPA for review.  *See* § 7661d(a)(1).   "If any permit contains provisions that are determined by the Administrator as not in compliance with the applicable requirements . . . the Administrator shall … object to its issuance" within 45 days. § 7661d(b)(1).  If the administrator does object, the permit may not be issued unless it is revised to meet the objections. *See* §§ 7661d(b)(3),(c). If the EPA does not object to a proposed permit, "any person may petition the Administrator within 60 days after the expiration of the 45-day review period . . . to take such action." § 7661d(b)(2).  The Administrator must then grant or deny the petition within 60 days. *Id.*  "[A]ny denial of such petitions shall be subject to judicial review." *See id.*   Under the statutory scheme, any direct review of the Administrator's decision is reviewed by the court of appeals. *See* § 7607(b)(1). Most importantly, "[a]ction of the Administrator with respect to which review could have been obtained . . . *shall not be subject to judicial review* in civil or criminal proceedings for enforcement." § 7606(b)(2) (emphasis added).

Sierra Club argues the Defendants in this case cannot avail themselves of the affirmative defenses listed in Big Brown's Title V permit because they were not yet incorporated into the Texas SIP.  Sierra Club is essentially attacking the

contents of Big Brown's permit in this lawsuit, arguing the affirmative defenses should never have been included in the permit and should not be applied in this lawsuit.   This is nothing more than an impermissible collateral attack, and the Court lacks jurisdiction to entertain such claims.

This case is analogous to *Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008 (8th Cir. 2010).  There, Sierra Club contended that modifications to a power plant made it a "new source" subject to the CAA's New Source Performance Standards ("NSPS") limits. *Sierra Club v. Otter Tail Corp.,* 608 F. Supp. 2d 1120, 1131 (D.S.D. 2009) *aff'd sub nom. Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008 (8th Cir. 2010).  The South Dakota Department of Environment and Natural Resources, however, amended the Title V permit and did not require defendants to comply with the NSPS provisions of the CAA.  The EPA never took any action on the permit, and Sierra Club failed to petition the EPA to object to the issuance of the permit. *See id.*  In its suit, Sierra Club contended that the power plant was liable for violations of the CAA's NSPS limits, even though the permit authorized the activity. *See id*.

The court held the district court lacked subject matter jurisdiction to hear the claim. *See Otter Tail Power Co.*, 615 F.3d at 1021.  The court concluded Sierra Club needed to assert its objections to the plant's permit *during*, not after, the permitting process.[4]  The court reasoned, "[T]o allow plaintiffs to raise issues

---

[4] This rule was also stated in *Romoland School District v. Inland Empire Energy Center LLC,* 548 F.3d 738 (9th Cir. 2008), where the court stated, "By creating in 42 U.S.C. § 7661d(b)(2) an

resolved during the permitting process long after that process is complete would upset the reasonable expectations of facility operators and undermine the significant investment of regulatory resources made by state permitting agencies." *Id.* at 1022.  Furthermore, "[a]bsent clear evidence to the contrary, we must conclude Congress intended a more sensible and efficient regulatory scheme."

It is significant to note that the jurisdictional bar is an entirely separate bar from the permit shield, and reading the statute in such a way "does not read [the permit shield] out of the statute."  *See id.*  The court noted:

> Sierra Club may be correct that the district court's interpretation of §§ 7661d [(the "permit shield")] and 7607 [(the jurisdictional bar)] restricts the permit shield's applicability, but this does not persuade us that its interpretation is erroneous. While § 7661c(f) is a statutory defense to liability, § 7607(b)(2) limits district court subject matter jurisdiction.  To the extent the two provisions are in tension, *the jurisdictional limit is paramount.*  Sierra Club argues that our interpretation of the jurisdictional provisions should not curtail the scope of the permit shield, but the more fundamental rule of construction holds that we must not expand federal court jurisdiction in service to a broad reading of the permit shield.

*Id.* at 1023 (emphasis added).  The jurisdictional bar is paramount, and Sierra Club cannot now challenge the contents of the Title V permit when it should have done so during the permitting process.

Sierra Club in response argues it could not have raised any objection because "the rule [incorporating the affirmative defenses into the Texas SIP] was

---

avenue of judicial review that passes through 42 U.S.C. § 7607, Congress effectively foreclosed the alternative avenue of citizen suit enforcement through 42 U.S.C. § 7604." *Id.* at 755.

indisputably still very much in flux and subject to EPA's ongoing review under the SIP process." The Court disagrees; the issue was ripe at the time of the permitting process, and the issue was straightforward—Big Brown's Title V permits included defenses not yet incorporated into the Texas SIP. Sierra Club without a doubt could have petitioned the EPA to object to the Title V permit. However, Sierra Club did not do so, and now, it is barred from objecting to components of the permit that Sierra Club believes are contrary to the Texas SIP. *See id.* at 1023.

The Court believes Defendants can assert *any* of the affirmative defenses that were included in Big Brown's Title V permit, and Sierra Club may not collaterally attack the contents of any of Big Brown's Title V permits. Sierra Club is limited to challenging whether or not Defendants complied with the requirements in Big Brown's permit.

At this juncture, the Court does not agree with the Defendants that § 101.222(d) & (e) were incorporated into their 2005 permit. However, the Court does agree that § 101.222(d) and (e) were certainly incorporated into Defendants' 2008 permit. Both the 2005 and 2008 permits state, "The permit holder shall comply with the following sections of 30 TAC Chapter 101 (General Air Quality Rules): . . . 30 TAC § 101.222 (relating to Demonstrations)." The 2005 permit was issued before the affirmative defenses now contained in § 101.222(d) and (e) were amended into the Texas Administrative Code. Defendants admit that the current version of § 101.222 did not become effective

15

until January 23, 2006, which is *after* Big Brown's 2005 permit was issued. Thus, these defenses were not included in the 2005 permit, but Big Brown's Title V permit was renewed in 2008. At that time, §101.222 contained the affirmative defenses at issue in this case, and the Court believes they were then incorporated into the 2008 permit.

Finally, the Court must consider whether defendants have raised a genuine issue of material fact. Having examined the STEERS Reports and Quarterly Reports attached as exhibits to Defendants' response, the Court is persuaded it cannot enter summary judgment on liability. Defendants, at the very least, have raised a fact issue that they are not liable for any violations that were committed after the 2008 permit took effect.

### 3) The Court Must Apply the Current Law

There is also another compelling reason the Court believes the affirmative defenses should apply in this suit. Although the alleged misconduct occurred before the affirmative defenses were incorporated into the Texas SIP, the Court is persuaded it is to apply the current law, not the law in effect at the time of the alleged violations.

Ordinarily, a court should apply "the law in effect at the time it renders its decision." *Brady v. Sch. Bd. of City of Richmond*, 416 U.S. 696, 711 (2006). However, there is a strong presumption against giving a statute retroactive effect. Commentators have noted that "[a] retroactive statute would partake in character of mischiefs of an ex post fact law . . . [and] it would be against every sound

16

principle." 1 James Kent, *Commentaries on American Law* 426 (1826)).  In fact, "the presumption against retroactive legislation is deeply rooted in [the Court's] jurisprudence, and embodies a legal doctrine centuries older than our Republic." *Landgraf v. USI Film Prod.*, 511 U.S. 244, 265 (1994).  But, it is important to note that "[a] statute does not operate retrospectively merely because it is applied in a case arising from conduct antedating the statute's enactment." *See id.* (citing *Republic Nat. Bank of Miami v. United States*, 506 U.S. 80, 100 (1992) (Thomas, J. concurring in part and concurring in judgment)).

The Court prescribed a two-part test for courts to determine how to apply new law or regulations to antecedent events. [5]  The Court stated:

> When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, *i.e.,* whether it would impair the rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

*Id.* at 280.

The first step in the *Landgraf* analysis is to determine whether the EPA prescribed the proper reach of the rule. In this case, the EPA did not expressly

---

[5] In this case, it is important to note that although the Court in *Landgraf* considered the application of a new statute to past conduct, courts apply the same test to determine whether a new regulation applies to past conduct. *See Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 645 (6th Cir. 2006)

state the proper reach of the rule.  Therefore, the Court must move to the second step in the analysis.

The next step in the *Landgraf* analysis is to determine whether application of the rule would "produce an impermissible retroactive effect." *I.N.S. v. St. Cyr,* 533 U.S. 289, 291 (2001).  The Court explained a statute has an impermissible retroactive effect "when it takes away or impairs vested rights acquired under existing law, or creates a new obligation, imposes a new duty, or attaches a new disability." *Id.* at 321.  The only question in this case under the guidance in *St. Cyr* is whether the new affirmative defenses in the Texas SIP took away or impaired a vested right from Sierra Club.

The Court believes the affirmative defenses did not take away any vested right.  Sierra Club has no right to obtain a civil penalty.  The only party with a meaningful claim to a potential civil penalty is the United States (which approved the affirmative defenses), since any penalty levied pursuant to the Clean Air Act's citizen-suit provision is paid to the United States.  *See* 42 U.S.C. § 7604(g).  Also, the Court does not believe, nor does Sierra Club argue, that it has a vested right to a remedy that has yet to be awarded.  *See American Steel Foundaries v. Tri-City Central Trades Counsel*, 257 U.S. 184, 201 (1921) (holding a plaintiff had no vested right in a remedy ordered by the district court while the order was appealed).

Therefore, the affirmative defenses in this case do not have a retroactive effect.   Because there is no retroactive effect, the presumption against

retroactivity does not apply. *See Landgraf*, 511 U.S. at 280. Thus, the Court should "apply the law in effect" at the time of the suit, and Defendants in this case can invoke the affirmative defenses, even though they were incorporated after the time of the alleged misconduct. *See id.*

> 4) Intertwined Issues

The Plaintiff also suggests the Court should enter summary judgment on liability since the affirmative defenses in this case only affect civil penalties. Sierra Club argues liability is clear such that the Court only needs to ascertain damages and fashion injunctive relief. The Court, however, still does not believe summary judgment on liability is proper at this time.

Summary judgment may be inappropriate when "a fuller record is thought to be a prerequisite to intelligent, informed resolution of complex questions of law." *Tanaka v. Immigration & Naturalization Serv.*, 346 F.2d 438, 447 (2d Cir. 1965) (citing *Kennedy v. Silas Mason Co.*, 334 U.S. 249, 256–57 (1948)); *Miller v. Gen. Outdoor Adver. Co.*, 337 F.2d 944 (2d Cir. 1964). Even if the Court agreed with the Plaintiff, the Court is not situated to fashion any type of injunctive relief without a better understanding of the Defendants alleged liability.

## IV. Conclusion

The Court declines to entertain Plaintiff's request for summary judgment on standing. Furthermore, the Court is persuaded it cannot enter summary judgment on the issue of liability because Defendants have raised a fact issue on their affirmative defenses. Accordingly, it is

**ORDERED** that Defendants shall have until September 20th to file a supplemental response to the issue of standing.  It is further

**ORDERED** that Plaintiff shall have seven days after Defendants file their supplemental response to file a supplemental reply.  It is further

**ORDERED** that Plaintiff's request for summary judgment solely on the issue of liability is **DENIED**.

**SIGNED** this _20_ day of August, 2013.

_____
WALTER S. SMITH, JR.
UNITED STATES DISTRICT JUDGE