**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | | |
|---|---|---|
| SIERRA CLUB, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 6:12-cv-00108-WSS |
| ENERGY FUTURE HOLDINGS | § | |
| CORPORATION and LUMINANT | § | |
| GENERATION COMPANY LLC, | § | |
| | § | |
| Defendants. | § | |

**DEFENDANTS' TRIAL BRIEF
ON THREE LEGAL ISSUES**

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................. 3

I.   The Court should defer to TCEQ's investigation of the opacity
events at issue in this case, which determined that all of those
events satisfy the affirmative-defense criteria in 30 Tex. Admin.
Code § 101.222. ................................................................................................ 3

II.  The portion of Sierra Club's claim that seeks relief based on
excess opacity during MSS activities has been rendered moot by
a revision to Big Brown's Title V permit that authorizes excess
opacity during MSS activities. ......................................................................... 5

A.   In December 2011, TCEQ amended Permit No. 56445 to
authorize and regulate opacity during planned MSS, and
Luminant has applied for a minor revision that incorporates
this amendment into Big Brown's Title V permit. ............................... 6

B.   Luminant's pending application for a minor revision to Big
Brown's Title V permit makes Permit No. 56445, as
amended in December 2011, valid and enforceable as a
matter of federal law. ........................................................................... 9

C.   The pending minor revision moots the portion of Sierra
Club's claim challenging excess opacity events that
occurred during planned MSS as defined by the permit. ...................... 12

D.   The doctrine of primary jurisdiction bars Sierra Club from
challenging the validity of the minor revision. ................................... 14

III. Sierra Club's requested civil penalty is inconsistent with the
Clean Air Act's citizen-suit statute. ................................................................ 17

A.   There is no statutory numeric penalty in a Clean Air Act
citizen suit. ........................................................................................... 17

B.   While the Act's numeric-penalty provision does not apply,
Sierra Club has miscalculated what the maximum penalty
would be under that provision. .............................................................. 21

C.   The Act's eight penalty factors indicate that the upper limit
of a potentially appropriate penalty is less than 0.02% of
what Sierra Club seeks. ......................................................................... 23

CONCLUSION ............................................................................................................. 28

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alton Box Board Co. v. EPA*,
  592 F.2d 395 (7th Cir. 1979) ........................................................... 15

*Am. Auto. Mfrs. Ass'n v. Mass. Dept. of Envtl. Protection*,
  163 F.3d 74 (1st Cir. 1998) ............................................................. 15

*Aquifer Guardians in Urban Areas v. Federal Highway Admin.*,
  779 F. Supp. 2d 542 (W.D. Tex. 2011) .......................................... 3, 4

*Auer v. Robbins*,
  519 U.S. 452 (1997) ....................................................................... 3, 4

*Avoyelles Sportsmen's League, Inc. v. Marsh*,
  715 F.2d 897 (5th Cir. 1983) ........................................................... 14

*Belt v. EmCare, Inc.*,
  444 F.3d 403 (5th Cir. 2006) ............................................................. 3

*Center for Marine Conservation v. Brown*,
  917 F. Supp. 1128 (S.D. Tex. 1996) .................................................. 4

*CleanCOALition v. TXU Power*,
  No. 6:06-cv-0355-WSS (May 21, 2007),
  *aff'd on other grounds*, 536 F.3d 469 (5th Cir. 2008) ........................ 15

*Coeur Alaska, Inc., v. Se. Alaska Conservation Council*,
  557 U.S. 261 (2009) ........................................................................... 4

*Fla. Power & Light Co. v. Costle*, 650 F.2d 579, 588 (5th Cir. Unit B
  June 1981) ......................................................................................... 3

*Ford Motor Credit Co. v. Milhollin*,
  444 U.S. 555 (1980) ........................................................................... 2

*Friends of the Earth, Inc. v. Laidlaw Envtl Servs. (TOC), Inc.*,
  528 U.S. 167 (2000) ......................................................................... 13

*Gwaltney of Smithfield v. Chesapeake Bay Foundation*,
  484 U.S. 49 (1987) ........................................................................... 20

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ........................................................................... 4

*Independent Nursing Home v. Simmons*,
  732 F. Supp. 684 (D. Miss. 1990) ..................................................... 3

*Keene Corp. v. United States*,
  508 U.S. 200 (1993) ......................................................................... 19

*Lauf v. E.G. Shinner & Co.*,
  303 U.S. 323 (1938) ......................................................................... 11

*League to Save Lake Tahoe, Inc. v. Trounday*,
  598 F.2d 1164 (9th Cir. 1979) ......................................................... 15

# TABLE OF AUTHORITIES

Page(s)

*Luminant Generation Co. LLC v. U.S. EPA,*
714 F.3d 841 (5th Cir. 2013) .................................................................................. 23

*Medina County Environmental Action Ass'n v. Surface Transp. Bd.,*
602 F.3d 687 (5th Cir. 2010) .................................................................................... 4

*Memorial Hermann Hosp. v. Sebelius,*
728 F.3d 400 (5th Cir. 2013) .................................................................................... 4

*Miss. River Revival, Inc. v. City of Minneapolis,*
319 F.3d 1013 (8th Cir. 2003) ................................................................................ 12

*Montgomery Envtl. Coalition v. Wash. Suburban Sanitary Comm'n,*
607 F.2d 378 (D.C. Cir. 1979) ................................................................................ 15

*Ogden Projects, Inc. v. New Morgan Landfill Co.,*
911 F. Supp. 863 (E.D. Pa. 1996) .......................................................................... 15

*Pizani v. M/V Cotton Blossom,*
669 F.2d 1084 (5th Cir. 1988) ................................................................................ 24

*Pub. Citizen, Inc. v. EPA,*
343 F.3d 449 (5th Cir. 2003) .................................................................................... 9

*Sawyer v. Whitley,*
945 F.2d 812 (5th Cir. 1991) .................................................................................. 12

*Seen v. Tile Layers Protective Union, Local No. 5,*
301 U.S. 468 (1937) ................................................................................................ 11

*Sierra Club v. Otter Tail Power Co.,*
615 F.3d 1008 (8th Cir. 2010). .............................................................................. 14

*Sierra Club v. Peterson,*
228 F.3d 559 (5th Cir. 2000) .................................................................................. 11

*Sierra Club v. TVA,*
592 F. Supp. 2d 1357 (N.D. Ala. 2009) ..................................................... 12, 13, 18, 19

*Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.,*
73 F.3d 546 (5th Cir. 1996) .................................................................................... 23

*Spellman v. Shalala,*
1 F.3d 357 (5th Cir.1993) ......................................................................................... 4

*Texas v. EPA,*
690 F.3d 670 (5th Cir. 2012) .................................................................................... 4

*Tull v. United States,*
481 U.S. 412 (1987) ................................................................................................ 24

*U.S. v. Alcoa, Inc.,*
2007 WL 5272187 (W.D. Tex. March 14, 2007),
*aff'd,* 533 F.3d 278 (5th Cir. 2008) ..................................................................... 3, 4

*U.S. v. BP Products North America Inc.,*
610 F. Supp. 2d 655 (S.D. Tex. 2009) ..................................................................... 3

# TABLE OF AUTHORITIES

Page(s)

*U.S. v. CITGO Petroleum Corp.*,
  723 F.3d 547 (5th Cir. 2013) .......................................................... 23, 24, 25

*U.S. v. Wong Kim Bo*,
  472 F.2d 720 (5th Cir. 1972) .................................................................. 19

*United States v. Allegheny Ludlum Corp.*,
  366 F.3d 164 (3rd Cir. 2004) .................................................................. 24

*United States v. Bajakajian*,
  524 U.S. 321 (1998)................................................................................ 24

*United States v. Dell'Aquilla, Enterprises and Subsidiaries*,
  150 F.3d 329 (3rd Cir. 1998) .................................................................. 23

*United States v. Marine Shale Processors*,
  81 F.3d 1329 (5th Cir. 1996) .................................................................. 23

*Virginia v. EPA*,
  108 F.3d 13978 (D.C. Cir. 1997) .............................................................. 3

*WildEarth Guardians v. Pub. Serv. Co. of Colo.*,
  690 F.3d 1174 (10th Cir. 2012) .............................................................. 13

**Statutes**

42 U.S.C. § 7413(e)(1)........................................................................... 21, 23

42 U.S.C. § 7413(e)(2)................................................................................ 20

42 U.S.C. § 7604(a) .................................................................................... 17

42 U.S.C. § 7607(b)(1) .......................................................................... 14, 16

42 U.S.C. § 7661d(b) .................................................................................. 14

42 U.S.C. § 7661d(b)(2) .............................................................................. 16

**Other Authorities**

3 Charles H. Koch, Jr., *Administrative Law and Practice* § 12.24[3]
  (2d ed. 1997) ............................................................................................. 3

45 Tex. Prac., Envtl. Law § 5:10 (2d ed. 2013–2014)............................... 10

U.S. EPA, *A Framework for Statute-Specific Approaches to Civil
  Penalty Assessments, EPA General Enforcement Policy #GM-22*
  (Feb. 16, 1984)......................................................................................... 24

**Rules**

30 Tex. Admin Code § 122.10(24) ............................................................ 10

30 Tex. Admin. Code § 122.216(1)–(6) ...................................................... 8

30 Tex. Admin. Code § 122.217(a) ......................................................... 9, 10

30 Tex. Admin. Code § 122.217(a)(1)(C) ................................................. 10

30 Tex. Admin. Code § 122.217(c) ............................................................. 9

## TABLE OF AUTHORITIES

Page(s)

30 Texas Administrative Code § 101.222 ................................................................. 5

**Regulations**

40 C.F.R. § 19.4 ....................................................................................................... 18

40 C.F.R. § 54.3(b) .................................................................................................. 22

40 C.F.R. § 70.7(e) .................................................................................................... 9

57 Fed. Reg. 32,250 (July 21, 1992) ......................................................................... 9

66 Fed. Reg. 51,895 (Oct. 11, 2001) ......................................................................... 9

66 Fed. Reg. 63,318 (Dec. 6, 2001) ........................................................................... 9

75 Fed. Reg. 68,989 (Nov. 10, 2010) .................................................................... 5, 6

INTRODUCTION

Defendants Energy Future Holdings Corp. and Luminant Generation Company LLC (hereinafter "Defendants") respectfully submit this trial brief to aid the Court in its consideration and decision of three legal issues relating to the upcoming trial in this matter.   *First*, it is undisputed that the Texas Commission on Environmental Quality ("TCEQ")—the agency charged by federal law with implementing the Clean Air Act in Texas—determined that the reported opacity events at issue in this case satisfy the affirmative-defense criteria of 30 Texas Administrative Code § 101.222.   That determination, including TCEQ's interpretation of the criteria, is entitled to deference from this Court.   Deference to TCEQ's findings is especially appropriate because those findings relate to the agency's evaluation of scientific data for which the agency possesses technical expertise.

*Second*, a recent amendment to Big Brown's air permit authorizes the vast majority of the opacity events at issue in this case, marking a change in the law that renders most of this case moot.   The lion's share of the opacity events at issue in this case—more than 85%—occurred during maintenance, startup, and shutdown ("MSS") activities as defined by that permit amendment.   In December 2011, TCEQ amended Big Brown's air permit—Permit No. 56445— to regulate MSS activities and authorize and limit opacity during those MSS activities.   By operation of law, this permit amendment became enforceable as a matter of federal law when Luminant submitted the changes as a minor revision to Big Brown's Title V federal operating permit.   Under EPA-approved, federally enforceable regulations, Luminant's submission of the minor-revision application caused the MSS provisions of Permit No. 56445 to be incorporated into the Title V permit effective immediately upon submission.   Thus, MSS activities (and excess opacity during those activities) are lawful, authorized, and permitted under Big Brown's Title V permit.   This revision to Big Brown's Title V permit moots Sierra Club's claim for penalties and

1

injunctive relief arising out of opacity exceedances that occurred during MSS activities, as defined by the permit.

**Third**, the civil penalty Sierra Club has requested is untenable.  To begin with, there should be no need for the Court to calculate a civil penalty for the many reasons discussed in this brief and in the Defendants' proposed findings of fact and conclusions of law.  In the event the Court does consider a civil penalty, Sierra Club cannot carry its burden of proving that a penalty is appropriate, and Sierra Club has provided the Court with a flawed framework.  For example, Sierra Club asks the impossible when it asks the Court "to assess the maximum penalty and adjust downwards."[1]   Unlike other environmental statutes, the Clean Air Act's citizen-suit provision does not contain a maximum numeric penalty amount.  The only method of penalty calculation that is consistent with the statute's text is one that starts at a penalty of zero and places the burden on Sierra Club to prove that the penalty should be adjusted upwards.[2]   In addition, the Clean Air Act allows Sierra Club to obtain a penalty only for every **day** on which an alleged violation (or violations) occurred, not—as it would like—for every individual 6-minute opacity exceedance.   And Sierra Club ignores the teachings of prior decisions awarding civil penalties in environmental cases.  The principles articulated in these cases demonstrate that the upper limit of any potential penalty in this case is less than 0.02% of the over-the-top amount Sierra Club requested in its proposed findings and conclusions.

---

[1]  Sierra Club's Proposed Findings of Fact and Conclusions of Law (Doc. 225), COL ¶ 66.

[2]  Order (Doc. 250) at 9 ("the burden of proving the appropriate penalty [is on] the plaintiff").

**ARGUMENT**

I.  **The Court should defer to TCEQ's investigation of the opacity events at issue in this case, which determined that all of those events satisfy the affirmative-defense criteria in 30 Tex. Admin. Code § 101.222.**

Courts should provide proper deference to an administrative agency's legal and factual determinations.   An agency's interpretation of, or finding of facts under, a regulation it is charged with enforcing is entitled to deference because "[a]dministrative agencies are simply better suited than courts to engage in such a process." *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 569 (1980); *see also* 3 Charles H. Koch, Jr., Administrative Law and Practice § 12.24[3] (2d ed. 1997) ("It is readily recognized that many conclusions reached by the agency are the result of a technical competence that even the most arrogant nonexpert could not hope to replicate."); *U.S. v. BP Products North America Inc.*, 610 F.Supp.2d 655, 709 (S.D. Tex. 2009).

In ***interpreting*** a regulation, federal courts defer to the agency that promulgated the regulation.   An agency's interpretation of its own regulation is "controlling unless plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997); *see also Belt v. EmCare, Inc.*, 444 F.3d 403, 408 (5th Cir. 2006) (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997)); *Aquifer Guardians in Urban Areas v. Federal Highway Admin.*, 779 F. Supp. 2d 542, 555 (W.D. Tex. 2011) ("Although plaintiff interprets the regulations differently, the Fifth Circuit has made clear '[c]ourts should defer to the agency's interpretation of its own [CE] regulations.'") (quoting *West Houston Air Comm. v. FAA*, 784 F.2d 702, 705 (5th Cir. 1986)). As the Fifth Circuit has emphasized, even EPA "should defer to the state's interpretation of the terms of its air pollution control plan when said interpretation is consistent with the Clean Air Act." *Fla. Power & Light Co. v. Costle*, 650 F.2d 579, 588 (5th Cir. Unit B June 1981); *see also*

*Virginia v. EPA*, 108 F.3d 1397, 1408 (D.C. Cir. 1997) (citing *Fla. Power & Light* with approval in the plan implementation development context).

Deference is also due to actions of a state agency administering federal programs, as TCEQ is doing in this case. *See Independent Nursing Home v. Simmons*, 732 F. Supp. 684, 688 (D. Miss. 1990); *United States v. Alcoa, Inc.*, No 1:03-cv-222, 2007 WL 5272187, at *7 (W.D. Tex. March 14, 2007), *aff'd*, 533 F.3d 278 (5th Cir. 2008). "[T]here is a strong public policy against a federal court's interference in state agency determinations absent some finding that the agency has violated federal law." *Alcoa*, 2007 WL 5272187, at *7. And, the Supreme Court has "recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985).

The same principles apply concerning the agency's **application** of its own regulations to a set of facts. *Coeur Alaska, Inc., v. Se. Alaska Conservation Council*, 557 U.S. 261, 283 (2009) ("[W]e do find that agency interpretation *and agency application* of the regulations are instructive and to the point.") (citing *Auer*, 519 U.S. at 461) (emphasis added); *see also, e.g.*, *Alcoa*, 2007 WL 5272187, at *7 ("a district court reviews the actions of a state agency administering federal programs as it would review the actions of a federal agency, including deference to reasoned administrative action" (citing *Indep. Nursing Home v. Simmons*, 732 F. Supp. 685, 688 (D. Miss.1990))). The courts review an agency's factual findings only for substantial evidence, *i.e.*, "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion." *Memorial Hermann Hosp. v. Sebelius*, 728 F.3d 400 (5th Cir. 2013); *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir.1993); *Aquifer Guardians in Urban Areas v. Federal Highway Admin.*, 779 F. Supp. 2d 542, 550 n.35 (W.D. Tex. 2011) ("The law requires

the judicial branch of government to give deference to administrative agency decisions so long as they are supported by substantial evidence and are not arbitrary and capricious."). Courts are at their most deferential in reviewing the agency's findings where an agency's particular technical expertise is involved. *Texas v. EPA*, 690 F.3d 670, 677 (5th Cir. 2012); *Medina County Environmental Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 699 (5th Cir. 2010); *Center for Marine Conservation v. Brown*, 917 F. Supp. 1128, 1143 (S.D. Tex. 1996) (When an agency is acting within its "own sphere of expertise," the Court's review "must be very deferential.").

For these reasons, it is appropriate for the Court to defer to TCEQ's undisputed determinations that all of the opacity events at issue satisfy the affirmative defense criteria under 30 Texas Administrative Code § 101.222.[3]

## II. The portion of Sierra Club's claim that seeks relief based on excess opacity during MSS activities has been rendered moot by a revision to Big Brown's Title V permit that authorizes excess opacity during MSS activities.

The December 2011 amendment to Permit No. 56445 regulating MSS activities and authorizing and limiting opacity during those MSS activities became enforceable as a matter of federal law when Luminant submitted the changes as a minor revision to Big Brown's Title V federal operating permit. This revision to Big Brown's Title V permit moots Sierra Club's claim for penalties and injunctive relief arising out of opacity exceedances that occurred during MSS activities. While there remains a live controversy between the parties as to whether the opacity exceedances that occurred during upsets/malfunctions (which make up 15% or less of the events at issue) met the affirmative defenses, the balance of the Complaint is now moot.

---

[3] *See* Defendants' Proposed Findings of Fact and Conclusions of Law, Attachment C (Doc. 220-3) (summarizing TCEQ's investigations, findings, and determinations as to each of the opacity events at issue).

A.    **In December 2011, TCEQ amended Permit No. 56445 to authorize and regulate opacity during planned MSS, and Luminant has applied for a minor revision that incorporates this amendment into Big Brown's Title V permit.**

In November 2010, the U.S. Environmental Protection Agency ("EPA") instructed the State of Texas to regulate opacity during planned startup and shutdown events via permit instead of via affirmative defense.  EPA explained that it has long "recognized that sources may, despite good practices, be unable to meet emission limitations during periods of startup and shutdown." 75 Fed. Reg. 68,989, 68,992 (Nov. 10, 2010).  EPA endorsed Texas's approach of addressing startup and shutdown opacity via permit, "agree[ing] with the State that it is appropriate to consider appropriate emission limits that would apply during periods of planned startup and shutdown and incorporate them into NSR SIP permits."  *Id.* at 68,995.

Shortly thereafter, Luminant applied for an amendment to one of its NSR SIP permits—specifically, TCEQ Air Permit No. 56445—for the purpose of "incorporat[ing] into the permit the planned Maintenance, Startup, and Shutdown (MSS) emissions that occur at [Big Brown]."[4] In the application, Luminant explained that Big Brown uses "electrostatic precipitators (ESP) and fabric filter baghouses [that operate] in series" to control opacity,[5] that these control devices, "by design, [are] not operational" during startup and shutdown,[6] and that as a consequence "[o]pacity may exceed 20% for periods of time during startup and shutdown."[7]  Luminant also described the steps it would take to limit opacity during startup and shutdown, including

---

[4] Exhibit D-12.15 at 1-1.

[5] *Id.* at 2-1.

[6] *Id.* at 3-1.

[7] *Id.* at 2-2.

"minimizing the duration of [startup and shutdown] activities through the use of [] good operating practices" and "ensuring the ESP is on-line as soon as technically practicable."[8]

In the course of evaluating Luminant's application to amend Permit No. 56445, the Texas Commission on Environmental Quality ("TCEQ") determined that amending the permit would not cause an increase in pollution or create a risk of harm to human health.  In its Permit Amendment Source Analysis and Technical Review, TCEQ determined that the "permit amendment will not change the existing annual allowable emissions for the two main utility boilers" and that "[t]he minor emissions increases from all facilities associated with this amendment are less than . . . de minimis levels."[9]  TCEQ also performed air-quality modeling to ensure that the permit amendment "would not cause an exceedance of the NAAQS" or lead to "off-property impacts [] that would endanger human health or the environment."[10]  TCEQ's independent air modeling confirmed that there would be no exceedance of the NAAQS "even when considering the worst case emissions scenario" and that "no adverse impacts to public health and the environment are anticipated as a result of quantifying and permitting emission rates for existing emissions from existing MSS activities."[11]

Accordingly, in December 2011, TCEQ amended Permit No. 56445 to specifically authorize and regulate excess opacity during MSS activities.[12]  Under the amended permit, "[o]pacity greater than 20 percent . . . is authorized when the permit holder complies with the

---

[8] *Id.* at 4-1.

[9] Exhibit D-6 at 1–2 (emphasis omitted).

[10] *Id.* at 4.

[11] *Id.*

[12] Exhibit D-5, Cover Letter at 1.

MSS duration limitations and other applicable work practices identified below."[13]   For the first time, the permit provided a definition of "planned startup" and "planned shutdown" and provided specific duration limitations on both.[14]   The duration limitations require planned startups and shutdowns to be limited to 24 hours.   If a startup or shutdown exceeds 24 hours, the overage is deducted from an annual hours bank of 600 hours.   The applicable work practices require Big Brown to "comply with . . . the permitee's written Standard Operating Procedures manual during planned MSS" and "operate in a manner consistent with those procedures to minimize opacity by placing the ESP and baghouse into service as soon as practical during planned startups or removing the ESP and baghouse from service as late as possible during planned shutdowns, once the baghouse inlet gas temperature is between 200 and 300 degrees F."[15]

Finally, and of particular relevance to this case, in December 2011 Luminant submitted this MSS amendment as a minor revision to incorporate "the amended conditions of Air Quality Permit No.56445[] related to maintenance, startup, and shutdown activities" into Big Brown's federal Title V operating permit.[16]   The minor-revision application described the change it sought to the Title V permit, described the emission units affected, described the emissions resulting from the change, included provisional terms and conditions codifying the new applicable requirements, stated that the requested change qualified for a minor permit revision, and was

---

[13] *Id.*, Special Conditions at 2.

[14] These new definitions of "planned startup" and "planned shutdown" effected an important change in the regulatory treatment and classification of MSS activities.   Previously, MSS activities at Big Brown were classified as "unplanned" because they were "not the type of event normally authorized by permit." *See* 30 Tex. Admin. Code § 101.11(108)(A).   Because these same MSS activities are now authorized by Permit No. 56445, they are now classified as "planned."   Thus, MSS activities that would have been treated as unplanned under the affirmative-defense regulations prior to December 2011 are now treated as planned under the permit.

[15] *Id.*, Special Condition at 2–3.

[16] Exhibit D-7, Cover Letter at 1 (D-7 at 4)

certified by the responsible official.[17]  Accordingly, the application satisfied all of the regulatory requirements for a minor permit revision.  *See* 30 Tex. Admin. Code § 122.216(1)–(6).[18]

### B. Luminant's pending application for a minor revision to Big Brown's Title V permit makes Permit No. 56445, as amended in December 2011, valid and enforceable as a matter of federal law.

By operation of law, the MSS provisions of amended Permit No. 56445 are part of the plant's Title V operating permit by virtue of Luminant's submission of an application for a minor revision.  While TCEQ has not yet acted on the revision, the EPA-approved regulation that governs minor permit revisions provides that as long as certain prerequisites are satisfied, "changes at a site requiring a minor permit revision may be operated ***before the issuance of the revision***."  30 Tex. Admin. Code § 122.217(a) (emphasis added).   Under that regulation, once the permit holder has applied for a minor revision, "[t]he permit holder ***need not comply with the original terms and conditions*** . . . that have been replaced by [the] provisional terms and conditions" of the minor revision; compliance with the original terms and conditions is excused even "***before issuance . . . of a revision***."  *Id.* § 122.217(c) (emphasis added).

Section 122.217 is part of Texas's federally approved Title V permitting program.  The language of § 122.217 mirrors the language of the federal regulation it implements:

> The State program may allow the source to make the change proposed in its minor permit modification application immediately after it files such application. ***After***

---

[17] *Id.*, Certification by Responsible Official, Form OP-2 Table 1 & Table 2, and Form OPR-SUMR Table1 & Table 2 (D-7 at 6–11).

[18] Several other provisions of Big Brown's Title V permit that have played an important role in this case were also added to the permit via a minor revision.  As the Court explained in its order granting Defendants' motion for partial summary judgment on Sierra Club's particulate-matter ("PM") claim, "[i]n 2008, Defendants submitted a 'Minor Revision Application'" that incorporated into Big Brown's Title V permit a "Compliance Assurance Monitoring" ("CAM") provision" for PM that excluded periods of MSS and upset/malfunction from PM compliance calculations.  Doc. 240 at 7–8.  And as the Court explained in its order denying Sierra Club's motion for partial summary judgment on liability, that same 2008 minor revision resulted in the site-specific incorporation of the § 101.222 affirmative defenses into Big Brown's permit.  *See* Doc. 162 at 15–16.

*the source makes the change* allowed by the preceding sentence, *and until the permitting authority . . . [takes action,] the source need not comply with the existing permit terms and conditions it seeks to modify*.

40 C.F.R. § 70.7(e) (emphasis added).  Not surprisingly, then, EPA has approved § 122.217 (as well as TCEQ's other regulations pertaining to minor permit revisions) as consistent with the requirements of the Clean Air Act.  *See* 66 Fed. Reg. 51,895 (Oct. 11, 2001) (EPA's proposed approval of § 122.217); 66 Fed. Reg. 63,318 (Dec. 6, 2001) (EPA's final approval); *Pub. Citizen, Inc. v. EPA*, 343 F.3d 449, 463 (5th Cir. 2003) (upholding EPA's approval).[19]  As an EPA-approved part of Texas's Title V permitting program, § 122.217 has the force and effect of federal law.  *See* 57 Fed. Reg. 32,250, 32,270 (July 21, 1992) (unless EPA expressly provides otherwise, a state's EPA-approved Title V regulations are "enforceable as a matter of Federal Law under the Act").

The structure of this EPA-approved, federally enforceable Title V permitting regulation ensures there is never a time during which state law and federal law diverge as to the contents of a source's Title V permit.  The rules governing minor revisions to Title V permits create a "federally enforceable unless and until disapproved" framework.  Where a permit holder has submitted an application for a minor revision, the revision is incorporated by operation of law into the Title V permit during the pendency of the application.  *See* 45 TEX. PRAC., ENVTL. LAW § 5:10 (2d ed. 2013–2014) (when a "Title V permit holder submits an application for a minor permit revision . . . , the permit holder can operate the change before the issuance of the revised permit"); *accord* 30 Tex. Admin. Code § 122.217(a).  This ensures the Title V permit remains a complete, accurate "'source-specific Bible for Clean Air Act compliance.'"  *See* Order (Doc.

---

[19] Sierra Club's prior filings acknowledge that the "Title V . . . regulations in 30 Tex. Admin. Code Chapter 122" are "EPA-approved."  Doc. No. 135  at 2.

240) at 5 (quoting *Virginia v. Browner*, 80 F.3d 869, 873 (4th Cir. 1996)).   Simply put, by giving immediate legal effect to pending minor revisions, § 122.217 eliminates any possibility of a "permit gap."

Through its promulgation of 40 C.F.R. § 70.7(e) and approval of 30 Tex. Admin. Code § 122.217(a), EPA has made the decision to allow permit holders such as Luminant to begin implementing a minor permit revision even before TCEQ approves the revision and issues a revised Title V permit.  As long as "provisional terms and conditions . . . are established and submitted as part of the minor revision application," the changes authorized by the revision "can be operated (or their operation continued) before the review and approval of the minor revision." TCEQ Air Permits Division, *Responses to Maintenance, Startup, and Shutdown (MSS) Questions from Advanced Air Permitting Seminar* at 40–41 (Sept. 2006); *accord* 30 Tex. Admin. Code § 122.217(a)(1)(C); *see also* 30 Tex. Admin. Code § 122.10(24).  In its pending application for a minor revision to Big Brown's Title V permit, Luminant met the requirements of § 122.217 by establishing and submitting that it "will comply with the amended requirements of Permit No. 56445 as provisional terms and conditions of the Federal Operating Permit."[20]  Federal law thus authorizes Big Brown to engage in MSS activities—and experience opacity greater than 20% during those activities—on the terms and conditions established by Permit No. 56445.[21]

---

[20] *See* Defendants' Exhibit D-7, OP-2 Table 2, Revision No. 01 (D-7at 8).

[21] Moreover, the Clean Air Act itself makes "any permit term or condition" enforceable under federal law. See 42 U.S.C. § 7604(f)(4).   Under 30 Tex. Admin. Code § 122.217(c), the provisional terms and conditions of the minor revision supersede and replace the original terms and conditions immediately upon submission of the minor-revision application.  Accordingly, the provisional terms and conditions of Big Brown's pending minor revision are also made federally enforceable by § 7604(f)(4).

**C.    The pending minor revision moots the portion of Sierra Club's claim challenging excess opacity events that occurred during planned MSS as defined by the permit.**

As a result of Luminant's pending application for a minor revision to incorporate amended Permit No. 56445 into Big Brown's Title V permit, the Title V permit specifically permits and authorizes opacity in excess of 20% during MSS activities.  More than 85% of the opacity exceedances that occurred at Big Brown between July 2007 and December 2010 occurred during MSS activities that would be encompassed by Permit No. 56445.  In other words, 85% or more of the events that Sierra Club challenges in this case, if they occurred today, would be specifically authorized and permitted as a matter of federal law.  Permit No. 56445 thus moots all but a sliver of Sierra Club's opacity claim.

Most fundamentally, as a matter of both common sense and black letter law, a federal court has no authority to enjoin lawful conduct.  *See Lauf v. E.G. Shinner & Co.*, 303 U.S. 323, 328 (1938) (a federal district court may not "enjoin acts declared . . . to be lawful"); *Seen v. Tile Layers Protective Union, Local No. 5*, 301 U.S. 468, 483 (1937) (injunctive relief will not issue "against the lawful conduct of another"); *Sierra Club v. Peterson*, 228 F.3d 559, 571 (5th Cir. 2000) (a district court may not enter an injunction that fails "to distinguish between legal and illegal future [conduct]").  Permit No. 56445 expressly authorizes and makes lawful opacity in excess of 20 percent during MSS activities.  The permit thus bars Sierra Club from obtaining injunctive relief as to excess opacity that occurs during MSS activities.

Similarly, as this Court recognized in dismissing Sierra Club's PM claim, it has long been settled that "'[a] case seeking injunctive relief based on conduct that has become lawful due to a change in the law is rendered moot by the change in law.'"  Doc. No. 240 at 17 (quoting *Sierra Club v. TVA*, 592 F. Supp. 2d 1357, 1376 (N.D. Ala. 2009); *accord Sawyer v. Whitley*, 945 F.2d 812, 814 n.1 (5th Cir. 1991).  For this reason, injunctive relief is not available to remedy past

opacity exceedances at a plant that is in compliance with its current permit.  *See TVA*, 592 F. Supp. 2d at 1376–77.  Here, excess opacity during MSS has become lawful due to the change in Permit No. 56445.   Sierra Club does not dispute that Big Brown presently operates in compliance with the duration and work-practice requirements (and all other terms and conditions) of amended Permit No. 56445.  As the Court has already explained, where, as here, "the threat of a future violation or harm has been nullified by an approved permit, 'there is no factual or legal ground to impose injunctive relief, and the case has become moot.'"  Doc. No. 240 at 17 (quoting *TVA*, 592 F. Supp. 2d at 1377).

As for Sierra Club's request for a civil penalty, the Court's order dismissing the PM claim also correctly holds that a citizen suit seeking civil penalties is mooted by the issuance of a permit that authorizes the activities for which the suit seeks penalties. Doc No. 240 at 16–17 ("Once a Title V permit is issued, a civil action seeking civil penalties for conduct allowed by the permit becomes moot."); *accord Miss. River Revival, Inc. v. City of Minneapolis*, 319 F.3d 1013, 1015–17 (8th Cir. 2003) ("Because permits have now issued, . . . plaintiffs' civil penalties claims are moot . . . ."); *see also WildEarth Guardians v. Pub. Serv. Co. of Colo.*, 690 F.3d 1174, 1186–87 (10th Cir. 2012) (claim for civil penalties mooted by a change in the governing regulations). This rule is the logical consequence of the remedial purpose of a civil penalty, which is to deter future misconduct.  *See, e.g.*, *Friends of the Earth, Inc. v. Laidlaw Envtl Servs. (TOC), Inc.*, 528 U.S. 167, 185–86 (2000).  Where the conduct that would be penalized has become lawful and permitted, that conduct is no longer *mis*conduct, and a "claim for civil penalties, even if successful, would have no deterrent value." *WildEarth Guardians*, 690 F.3d at 1187.

In sum, Sierra Club cannot escape the combined significance of these three facts:

1) Luminant has submitted an application for a minor revision that incorporates Permit No. 56445's authorization and regulation of excess opacity during MSS into Big Brown's

Title V permit.

2) Pursuant to 30 Tex. Admin. Code § 122.217(a) (an EPA-approved, federally enforceable Title V regulation), the submission of an application for a minor revision authorizes and requires Big Brown to operate pursuant to the terms and conditions of Permit No. 56445.

3) Excess opacity during MSS as defined in the permit is now expressly permitted under Big Brown's Title V permit.

Because Permit No. 56445's MSS provisions have become federally enforceable by operation of law, at least 85% of Sierra Club's opacity claim—the portion that seeks relief for opacity exceedances that occurred during the defined MSS activities—is moot.[22]

**D.  The doctrine of primary jurisdiction bars Sierra Club from challenging the validity of the minor revision.**

Thus far in this case, Sierra Club's strategy for attempting to circumvent minor revisions to Big Brown's permit has been to challenge the validity of the revision itself.  Sierra Club challenged the validity of the 2008 minor revision both as to its site-specific incorporation of the § 101.222 affirmative defenses, *see* Doc. No. 135 at 2–7, and as to its incorporation of the revised PM CAM provision, *see* Doc. No. 195 at 7–9, 12, 16–17.  In both instances, the Court concluded that Sierra Club's challenges to the validity of the 2008 minor revision were collateral attacks on the terms of Big Brown's Title V permit and thus foreclosed by 42 U.S.C. § 7607(b)(2)'s jurisdictional bar.  *See* Doc. No. 162 at 12–16 (affirmative defenses); Doc. No. 240 at 10–15 (PM CAM provision).

The same principle applies here, notwithstanding the fact that the minor revision incorporating Permit No. 56445's amended MSS provisions into Big Brown's Title V permit has yet not been finally approved.  Under the Clean Air Act, determinations as to a permit's validity

---

[22]In fact, Sierra Club's claim for injunctive relief is moot in its entirety.  Upsets and malfunctions, by their nature, are sudden, unpredictable, infrequent, sporadic, and unavoidable.  As such, they are not a proper subject for injunctive relief.  *See TVA*, 592 F. Supp. 2d at 1375–77 & n.6 (denying Sierra Club's request for an injunction as to future opacity events).

are committed to EPA in the first instance and to the appropriate Court of Appeals on judicial review.  *See* 42 U.S.C. § 7661d(b); *id.* § 7607(b)(1).  After EPA has issued its final approval of a permit, this commitment is enforced through the § 7607(b)(2) jurisdictional bar.  *See, e.g.*, *Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008, 1020–22 (8th Cir. 2010).  Before that time—when the permitting process is still underway and the jurisdictional bar is not directly applicable because EPA has not yet taken "final action," *see* 42 U.S.C. § 7607(b)(1)—the Act's commitment to agency primacy is enforced through the doctrine of primary jurisdiction.

The doctrine of primary jurisdiction bars Sierra Club from challenging the validity of the pending minor revision in proceedings before this Court.  Primary jurisdiction applies when a court has jurisdiction of a claim but "'enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.'"  *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 919 (5th Cir. 1983) (quoting *United States v. W. Pac. R.*, 352 U.S. 59, 64 (1956)).

The Clean Air Act commits first-instance permitting decisions to the discretion, authority, and expertise of EPA and relevant state agencies such as TCEQ.  *See, e.g.*, *Ogden Projects, Inc. v. New Morgan Landfill Co.*, 911 F. Supp. 863, 867 (E.D. Pa. 1996) ("Setting the terms and conditions of CAA permits is a discretionary function that Congress delegated to the EPA and individual state agencies in acknowledgement of their special expertise and competence.").  Accordingly, those agencies have primary jurisdiction over challenges to a permit's propriety or validity.  *See Am. Auto. Mfrs. Ass'n v. Mass. Dept. of Envtl. Protection*, 163 F.3d 74, 82–86 (1st Cir. 1998); *Montgomery Envtl. Coalition v. Wash. Suburban Sanitary Comm'n*, 607 F.2d 378, 381–83 (D.C. Cir. 1979); *League to Save Lake Tahoe, Inc. v. Trounday*,

598 F.2d 1164, 1174 (9th Cir. 1979); *Alton Box Board Co. v. EPA*, 592 F.2d 395, 399 n. 7 (7th Cir. 1979).[23]

This Court recognized that a citizen suit is not the proper vehicle for a pre-issuance challenge to the validity of a Clean Air Act permit in its decision in *CleanCOALition v. TXU Power*, No. 6:06-cv-0355-WSS (May 21, 2007), *aff'd on other grounds*, 536 F.3d 469 (5th Cir. 2008).  There, the plaintiff had brought a citizen suit against Luminant's predecessor challenging a TCEQ permitting process that was still under way; the plaintiff argued the permit Luminant had applied for, if issued, would violate the Clean Air Act.  This Court dismissed the case, holding that the suit was, in substance, an "attack[ on] Defendants' permit 'application' and [] essentially a collateral attack on the Texas permitting process.  The TCEQ has jurisdiction to review permit applications, not this Court."  *Id.* slip op. at 25–26.

If Sierra Club has complaints about the minor revision and wants to challenge the revision's validity, the Clean Air Act requires Sierra Club to pursue those challenges at the agency level, *see* 42 U.S.C. § 7661d(b)(2), or, if dissatisfied with the agency's resolution, seek judicial review in the Fifth Circuit, *see* 42 U.S.C. § 7607(b)(1).[24]  Just as the Act's jurisdictional bar forecloses collateral attacks to the validity of a final, issued permit, the doctrine of primary jurisdiction forecloses collateral attacks to the validity of a pending, not-yet-issued permit.

---

[23] It is especially appropriate for a federal court to defer to the primary jurisdiction of an agency in cases such as this one, where "the [defendants] have raised a substantial argument that the issuance of the permit will insulate them from all actions based on any discharge which conforms with the terms of the permit," such that "any relief th[e] court could grant [] might be mooted by the issuance of the permit." *Montgomery Envtl. Coalition*, 607 F.2d at 382.

[24] Sierra Club's complaints notwithstanding, the available data indicates that TCEQ's approval of the minor revision and issuance of a revised Title V permit is likely forthcoming.  Luminant applied for a minor revision incorporating planned MSS activities into the Title V permit for another one of its generating facilities, the Sandow Steam Electric Station in Rockdale, Texas.  *See* Exhibit D-185.  TCEQ has granted the Sandow application and issued a revised permit.  *See* Exhibit D-187.  Notably, EPA did not object to TCEQ's issuance of the revised Title V permit authorizing excess opacity during MSS at Sandow.

For purposes of proceedings before this Court, 30 Tex. Admin Code § 122.217 establishes that the MSS provisions of amended Permit No. 56445 are incorporated by operation of law into Big Brown's Title V permit and therefore are valid and enforceable as a matter of federal law.   Accordingly, at least 85% of Sierra Club's opacity claim—the portion that challenges excess opacity during MSS activities—is moot and should be dismissed.

### III.   Sierra Club's requested civil penalty is inconsistent with the Clean Air Act's citizen-suit statute.

The Court would only need to calculate a civil penalty if it were to determine first that TCEQ's investigative findings do no merit deference and second that some or all of the opacity events at issue in this case do not satisfy the affirmative-defense criteria in 30 Tex. Admin. Code § 101.222(d) or (e).   If the Court defers to TCEQ's investigative findings, or if the Court independently determines that the events in question satisfy the affirmative-defense criteria, there will be no need for a civil-penalty analysis.

In the event the Court does undertake to calculate a civil penalty, the following three principles should guide its calculus.   In short, Sierra Club cannot carry its burden of proving that a penalty is appropriate simply by citing to a civil-penalty provision of the Clean Air Act that does not apply to this case and asking the Court to impose the maximum penalty authorized by that provision.   A proper civil-penalty calculation, guided by the eight factors enumerated in 42 U.S.C. § 7413(e)(1), demonstrates that the upper limit of a potential penalty in this case is less than 0.02% of the amount Sierra Club has requested.

### A.   There is no statutory numeric penalty in a Clean Air Act citizen suit.

The maximum "statutory penalty" amount of "$37,500 per day" for violations after January 12, 2009, and "$32,500 per day" for violations on or before that date does not apply in Clean Air Act citizen suits.   There is a maximum penalty in EPA-filed federal enforcement

actions, but that maximum is set by 42 U.S.C. § 7413(b), and § 7413(b) does not apply in citizen suits.  The plain text of the citizen-suit statute requires the use of a "bottom-up" penalty calculus in which the Court starts from a baseline presumption that no penalty is appropriate.

The Clean Air Act's citizen-suit provision, 42 U.S.C. § 7604, contains no textual basis for a statutory penalty "maximum."   Section 7604(a) authorizes district courts "to apply ***any appropriate*** civil penalties."   42 U.S.C. § 7604(a) (emphasis added).   Thus, § 7604(a) does not specify a numeric amount for a maximum penalty.  Instead, 42 U.S.C. § 7413(e)(1) provides that "[i]n determining the amount of any penalty to be assessed under . . . section 7604(a)," a district court is to consider eight enumerated factors.  The plain text of these two statutes requires district courts to apply the eight statutory factors—without reference any statutory default amount—to determine what (if any) penalty is appropriate.

Sierra Club takes a contrary view and argues that not only that there is a statutory maximum penalty applicable to citizen suits but also that the Court should presume that this maximum penalty is the appropriate penalty.[25]   As support for its view, Sierra Club relies on 42 U.S.C. § 7413(b).[26]   That provision authorizes EPA to bring a civil judicial enforcement action and provides that EPA can "recover a civil penalty of not more than $25,000 per day for each violation."[27]   Thus, § 7413(b) does contain a numeric penalty "top."  But § 7413(b) only applies to federal enforcement actions filed by EPA.  By its terms, it does not authorize or apply to this citizen suit, which arises under § 7604(a).

---

[25] Sierra Club's Proposed Findings of Fact and Conclusions of Law (Doc. 225), FOF ¶¶ 148–54; COL ¶¶ 66–73.

[26] *See, e.g.*, Plaintiff Sierra Club's Opposition to Defendants' Motion to Exclude Certain Testimony and Opinions of Plaintiff's Expert Mark D. Ewen (Doc. 188) at 8 n.8.

[27] The penalty amounts in federal civil monetary penalty statutes are adjusted periodically to account for inflation.  *See* 40 C.F.R. § 19.4.  Hence Sierra Club's use of $32,500 for alleged violations occurring before January 12, 2009, and $37,500 for alleged violations occurring thereafter.

Relevant precedent confirms that § 7413(b) does not govern this action.  In *Sierra Club v. TVA*, the Eleventh Circuit rejected a similar attempt by Sierra Club to equate federal enforcement actions under § 7413(b) with citizen suits under § 7604(a).  *See* 430 F.3d 1337, 1352 (11th Cir. 2005).  The court held that "citizen suits, which are separately authorized by [§ 7604], are not 'federal enforcement' under [§ 7143(b)]."  *Id.*  As the Eleventh Circuit's holding makes clear, citizen suits are a different species of proceeding than federal enforcement actions, and the provisions of §7413(b) apply only to the latter, not to the former. *Id.*

The text of § 7413(e)(1) further confirms that § 7413(b)'s maximum penalty amount does not apply in citizen suits brought under §7604(a).  Section 7413(e)(1) enumerates eight penalty factors, and it expressly provides that those factors apply to the determination "of any penalty assessed under this section ***or section 7604(a)***" (emphasis added).  By contrast, § 7413(b) contains no similar language providing that its maximum-penalty figure applies to citizen suits under § 7604(a).[28]  "'Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'"  *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) (brackets omitted) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)); *accord U.S. v. Wong Kim Bo*, 472 F.2d 720, 721 (5th Cir. 1972) ("[W]here Congress has carefully employed a term in one place and excluded it in another, it should not be implied where excluded.").  By including the "or . . . under section 7604(a)" language in § 7413(e)(1) but excluding it from § 7413(b), Congress expressed its intention that the provisions of § 7604(b) should not apply in citizen suits.

---

[28] *See TVA*, 430 F.3d at 1337 n.7 ("Section [7413] refers to . . . § 7604(a) . . . only in its provision for 'Penalty assessment criteria.'" (quoting § 7413(e)(1)).

Sierra Club has tried to overcome the plain text of §§ 7413 and 7604 by citing cases decided under other federal environmental statutes in which courts have used a top-down penalty calculus based on a statutory maximum penalty.[29]   But all of these cases are either (1) federal enforcement actions under §7413(b), or (2) citizen suits under the Clean Water Act or the Resource Conservation and Recovery Act.   Unlike § 7604(a) of the Clean Air Act, the citizen-suit provisions of both the CWA[30] and the RCRA[31] include numeric maximum penalty amounts.[32] Thus, while courts often analogize between similar provisions of environmental laws where the statutory text is the same, where the text is materially different—as it is here—it is necessary to give effect to Congress's deliberate choice to not establish a statutory penalty amount. *See, e.g.*, *Gwaltney of Smithfield v. Chesapeake Bay Foundation*, 484 U.S. 49, 56-7 (1987) (where, as here, "Congress used nearly identical language in the citizen suit provisions of several other environmental statutes" but not the one at issue, the difference "could not have escaped Congress' attention").   Thus, the cases Sierra Club cites only serve to undercut its position.

Sierra Club's only basis for claiming there is a maximum penalty in this case is § 7413(b).   But § 7413(b) applies to federal enforcement cases brought by EPA. This is a citizen suit under §7604(a).   There is no basis for imposing a maximum penalty in this case.   Sierra Club's request for a civil penalty—and the top-down methodology it asks the Court to use in calculating that penalty—is foreclosed by the text of the Clean Air Act's citizen-suit statute.

---

[29] *See, e.g.*, Sierra Club's Proposed Findings of Fact and Conclusions of Law (Doc. 225), COL ¶ 66.

[30] *See* 33 U.S.C. § 1365(a) (authorizing "appropriate civil penalties under section 1319(d)" in a citizen suit); *id.*§ 1319(d) (authorizing "a civil penalty not to exceed $25,000 per day for each violation").

[31] *See* 42 U.S.C. § 6972(a) (referring to "penalties under section 6928(a) and (g)); *id.* §6928(g) (authorizing "a civil penalty in an amount not to exceed $25,000 for each such violation").

[32] Even in cases brought by the government where there is a numeric "top," district courts may, in their discretion, apply a "bottom up" approach. *See United States v. CITGO Petroleum Corp.*, 723 F.3d 547, 552 (5th Cir. 2013).

**B.**     **While the Act's numeric-penalty provision does not apply, Sierra Club has miscalculated what the maximum penalty would be under that provision.**

Even if § 7413(b)'s maximum penalty amount did apply here (and it does not), it would not authorize the penalty Sierra Club seeks.  Sierra Club has miscalculated and overstated what the maximum statutory penalty would be under § 7413(b).  Thus, even if the Court were to follow Sierra Club's preferred "top down" approach, the "top" would be a fraction of the penalty Sierra Club requests.

Under §§ 7604(a) and 7413(e), the proper unit of measure for a civil penalty is ***days***, not violations.  Sierra Club calculates its "maximum statutory penalty" by treating every 6-minute opacity reading that is over 30% as being subject to a penalty of either $37,500 or $32,500, depending on the date of occurrence.  But the statute directs that "[a] penalty may be assessed ***for each day of violation***," not for every 6-minute opacity reading during the day.  *See* 42 U.S.C. § 7413(e)(2) (emphasis added).  If the calculation were done "for each day," as the statute directs, the maximum statutory amount for the alleged opacity violations (which, again, does not apply) would be $6,310,000.[33]

Sierra Club again resorts to statutory misdirection in its attempt to justify its inflated penalty request.  Sierra Club claims that "penalties may be assessed per day for each violation," but as support for this claim it cites to 42 U.S.C. § 7413(b).[34]  But this is a citizen suit under § 7604(a), not a federal enforcement action under § 7413(b).  For all the reasons described in the previous section, *see infra* section III(a), § 7413(b) does not apply to this case.  The only

---

[33] There were a total of 182 days from July 2007 to December 2010 on which an opacity event occurred that is not exempt by 30 Texas Administrative Code 111.111(a)(1)(E).  *See* Defendants' Proposed Findings of Fact and Conclusions of Law (Doc. 220), COL ¶ 3; *see also id.* Attachments A & B.  Of these, 103 days were on or before January 12, 2009, and 79 days after (103 x $32,500 = $3,347,500; 79 x $37,500 = $2,962,500).  *Id.*

[34] Sierra Club's Proposed Findings of Fact and Conclusions of Law (Doc. 225), COL ¶ 64.

subsection of § 7413 that is applicable to citizen suits is § 7413(e), and it expressly provides that a penalty may be assessed only "for each day of violation."[35]

Sierra Club further inflates its penalty claim by including time periods and alleged violations not covered by the allegations in the complaint.  Sierra Club calculates its requested penalty based on opacity events "through the end of 2012."[36]  The complaint only alleges opacity violations "between July 2007 and December 2010."[37] Sierra Club's request for penalties based on events outside that timeframe rests on the erroneous assertion that "[t]he Complaint also alleges that Defendants continue to violate the limit."[38]  Not so.  Nowhere does the complaint allege any violations "through the end of 2012," and Sierra Club cites to no such allegation. When Sierra Club moved for partial summary judgment on liability, it sought judgment only as to opacity events that occurred between July 2007 and December 2010.[39]  Nor does Sierra Club's pre-suit notice letter give notice of any alleged opacity violations after December 2010.[40]  Thus, such claims are barred by the pre-suit notice requirement of 42 U.S.C. § 7604(b)(1).  *See* 40 C.F.R. § 54.3(b) (proper pre-suit notice must include "sufficient information to permit the recipient to identify . . . the date or dates of such violation").

In short, the statue authorizes a penalty for each day of violation, not for each violation during the day.  And Sierra Club can obtain a penalty only for those events over which it has

---

[35] To the extent Sierra Club contends that the number of 6-minute COMS readings above 30% during any particular day is significant, it can argue that point under the "duration of the violation" factor, 42 U.S.C. § 7413(e)(1), but not as a multiplier for its "maximum" penalty.

[36] Sierra Club's Proposed Findings of Fact and Conclusions of Law (Doc. 225), FOF ¶ 153.

[37] Sierra Club's Amended Complaint (Doc. 81) ¶ 26.

[38] Sierra Club's Proposed Findings of Fact and Conclusions of Law (Doc. 225), FOF ¶ 68.

[39] *See* Sierra Club's Motion for Partial Summary Judgment (Doc. 25) at 2, 6 ¶¶ 8–9, 14–16.

[40] *See* Notice of Intent to Sue (Doc. 1-2) at 2–3.

brought suit.  For these reasons, even if § 7413(b)'s maximum penalty amount applied in this suit

(again, it does not), the maximum penalty would be a fraction of the penalty Sierra Club seeks.

### C.    The Act's eight penalty factors indicate that the upper limit of a potentially appropriate penalty is less than 0.02% of what Sierra Club seeks.

For various reasons discussed elsewhere, the Court should not need to conduct a penalty

analysis.  If it does, the proper methodology for calculating a civil penalty in a Clean Air Act

citizen lawsuit is to start from a baseline presumption of zero penalty and award a penalty only if

the plaintiff can carry its burden of proving that the eight statutory penalty factors weigh in favor

of a penalty.  Those eight factors are:

1) the economic benefit of noncompliance

2) the seriousness of the violation;

3) the size of the business;

4) the economic impact of the penalty on the business;

5) the violator's full compliance history and good faith efforts to comply;

6) the duration of the violation as established by any credible evidence;

7)  payment by the violator of penalties previously assessed for the same violation; and

8) other factors as justice may require.

42 U.S.C. § 7413(e)(1).[41]  The Court is required to consider "all of the statutory factors before

settling on an amount."  *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546,

575–76 (5th Cir. 1996); *accord Luminant Generation Co. LLC v. U.S. EPA*, 714 F.3d 841, 846

(5th Cir. 2013).

The Court has broad discretion in determining how to calculate the penalty.  *E.g.*, *U.S. v.*

*CITGO Petroleum Corp.*, 723 F.3d 547, 551 (5th Cir. 2013) (quoting *Tull v. United States*, 481

U.S. 412, 427 (1987)); *see also United States v. Dell'Aquilla, Enterprises and Subsidiaries*, 150

---

[41] Any penalty assessed is deposited in the U.S. Treasury, except that up to $100,000 of such a penalty may, in the District Court's discretion, "be used in beneficial mitigation projects which are consistent with [the Act] and enhance the public health or the environment."  *Id.* § 7604(g).

F.3d 329, 339 (3rd Cir. 1998) ("The statute only requires that the fine be consistent with a consideration of each of the factors the court is obligated to evaluate.").  The Fifth Circuit has not directly addressed how a district court should go about calculating an "appropriate civil penalty" under the Clean Air Act's citizen-suit provision, in which there is no statutory numeric maximum penalty amount.[42]  However, there are a number of guideposts in the Fifth Circuit's decisions considering other statutory penalty provisions that can inform the Court's exercise of its discretion.  Three are particularly relevant to this case.  To the extent the Court decides it is necessary to conduct a civil-penalty analysis, these factors suggest any penalty imposed should be modest.

*First*, Sierra Club bears the burden of proof on the amount of any penalty.  As the Court recently explained, "the penalty assessment is part and parcel to the remedy issue, which is an element of Plaintiff's case in chief;" as such, "the burden of proving the appropriate penalty [is on] the plaintiff.").  Order of Feb. 20, 2014 (Doc. 250) at 9.  This is consistent with the well-settled principle that "the plaintiff bears the burden of proof to show the amount, as well as the fact of, damages." *Pizani v. M/V Cotton Blossom*, 669 F.2d 1084, 1088 (5th Cir. 1988).

*Second*, "proper consideration of economic benefit is integral to arriving at an appropriate damage award."  *CITGO*, 723 F.3d at 553.  Indeed, "the economic benefit factor creates a nearly indispensable reference point."  *Id.* at 554.  The remedial purpose of a civil

---

[42] The existing Fifth Circuit precedent on civil penalty calculations all involve cases where the statute provides a statutory numeric penalty—either other environmental laws (such as the CWA) or the federal enforcement provision of the CAA (42 U.S.C. § 7413(b).  *See, e.g.*, *United States v. CITGO Petroleum Corp.*, 723 F.3d 547, 550-1 (5th Cir. 2013) (CWA oil spill case under 33 U.S.C. § 1321(b)(7), which includes $25,000 per day penalty); *United States v. Marine Shale Processors*, 81 F.3d 1329, 1357-8 (5th Cir. 1996) (federal CWA and CAA enforcement action under 33 U.S.C. § 1319 and 42 U.S.C. § 7413(b), which include $25,000 "statutory" penalty); *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 573-4 (5th Cir. 1996) (CWA citizen suit applying statutory penalty of "$25,000 per day for each violation" in 42 U.S.C. § 1319(d)).

penalty is to deter future misconduct by recouping any economic gain that resulted from noncompliance. *See Tull*, 481 U.S. at 422–23; *CITGO*, 723 F.3d at 552. At the same, a civil penalty cannot be excessive. *See generally United States v. Bajakajian*, 524 U.S. 321 (1998). The economic-benefit analysis ensures that a civil penalty is high enough to serve its deterrent purpose and no higher.[43] For this reason, "a finding on the amount of economic benefit . . . is central to the ability of a district court to assess the statutory factors." *CITGO*, 723 F.3d at 554.

In this case, however, Sierra Club does not have any affirmative evidence on the issue of economic benefit. Sierra Club designated its only expert witness on this topic, Mark Ewen, as a rebuttal-only witness. *See* Order of Feb. 20, 2014 (Doc. 250) at 4. Ewen's testimony is limited to his critique of the economic-benefit analysis conducted by Defendants' expert, Dr. Anne Smith. *Id.* at 4, 12. In her expert report, Dr. Smith analyzed any "economic benefit" Defendants would have incurred from the opacity events at Big Brown and concluded that Defendants suffered a net economic loss from the events and thus already possess strong financial incentives to avoid future opacity events. Thus, the only "economic benefit" analysis that will be presented at trial will establish that no basis exists for assessing a positive economic civil-penalty factor for deterrence purposes. Given that "economic benefit serves as the starting point for calculating the civil penalty and is adjusted based on the remaining statutory factors," *CITGO*, 723 F.3d at 551, Sierra Club's lack of evidence on economic benefit weighs against the imposition of any penalty at all.

---

[43] Where there were several compliance options available to the operator, the court should use as the economic benefit the ***least costly*** compliance option, ***not*** "solutions [that are] considerably overpriced." *United States v. Allegheny Ludlum Corp.*, 366 F.3d 164, 185 (3rd Cir. 2004) ("We . . . hold that [the] economic benefit analysis should be based on the least costly method of compliance."). In some instances, the least cost compliance option will be applying for and obtaining a permit to authorize the activity at issue, and the cost of obtaining the permit, though perhaps "negligible," is the correct measure of economic benefit. *See* U.S. EPA, A Framework for Statute-Specific Approaches to Civil Penalty Assessments, EPA General Enforcement Policy #GM-22, at 7 (Feb. 16, 1984).

*Finally*, an empirical analysis of the relevant case law reveals that when courts properly apply the statutory penalty factors, they typically assess *less than 1%* of the "statutory maximum" as a reasonable and appropriate penalty. Table 1 provides representative penalty awards that have been affirmed by the Fifth Circuit and other courts of appeals.

**TABLE 1:  Representative Penalty Awards**

| Case | Statute at Issue | Alleged Maximum Penalty | Penalty Actually Awarded | Percent of Maximum Penalty Actually Awarded |
|---|---|---|---|---|
| *United States v. Marine Shale Processors*, 81 F.3d 1329 (5th Cir. 1996) | CAA | $1,560,000,000 (minor source violations) $1,175,000,000 (operation after variance denial) | $2,500,000 | 0.16% (minor source violations) 0.21% (operation after variance denial) |
| *Sierra Club v. Khanjee Holding (US) Inc.*, 655 F.3d 699 (7th Cir. 2011) | CAA | $41,712,500 | $100,000 | 0.24% |
| *Pound v. Airosol Co. Inc.*, 498 F.3d 1089 (10th Cir. 2007); *Pound v. Airosol Co. Inc.*, Case No. 02-2632 (D. Kan. May 8, 2009) | CAA | $62,562,500 | $10,000 | 0.016% |
| *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546 (5th Cir. 1996) | CWA | $20,225,000 | $186,070 | 0.92% |
| *United States v. Scruggs*, 2009 WL 600608 (S.D. Tex. Feb. 26, 2009). | CWA | $1,375,000 | $65,000 | 4.7% |

Sierra Club has offered various, conflicting theories on penalties in this case.  Its complaint seeks "a civil penalty of $37,500 per day" for violations after January 12, 2009, and

"$32,500 per day" for violations before that date.[44]  Then, in discovery, Sierra Club provided a sworn interrogatory response stating that the "factors in [42 U.S.C. § 7413(e)(1)] suggest that a penalty of **between 5 and 10 million dollars** is warranted in this case."[45]  And finally, in an abrupt shift from its interrogatory answer, Sierra Club states in its proposed findings of fact and conclusions of law that the "total maximum statutory penalty" is $337,612,500, which it asks the Court to assess without reduction.[46]

There is no need for the Court to attempt to reconcile these various theories.  All of them would result in a penalty that was proportionately far greater than the penalties awarded in the above-cited cited decisions.  In this case, a maximum penalty calculated using the correct number of days and the statutory maximum amount (which, again, applies only in EPA-filed federal enforcement actions, not in citizen suits) would be $6,310,000.  Applying the penalty criteria to this maximum amount, consistent with application of the criteria in other cases, would result in a final penalty amount of 1% ($63,100) or less of that maximum amount.

All that said, TCEQ has already investigated the opacity events at issue in this case and determined that all of them satisfy the affirmative-defense criteria in 30 Tex. Admin. Code § 101.222(d) or (e).  At trial, the evidence independently will show that TCEQ's investigative findings were correct and that all of the opacity events at issue qualify for an affirmative defense. The affirmative defenses in § 101.222 are a complete defense to a claim for a civil penalty.  *See Luminant Generation*, 714 F.3d at 847, 851–53.  As a consequence, there should be no need for

---

[44] Sierra Club's Amended Complaint (Doc. 81) at 11.

[45] Exhibit D-27, Plaintiff Sierra Club's Third Supplemental Responses to Defendants' First Interrogatories, No. 6 (July 15, 2013) (emphasis added)

[46] Sierra Club's Proposed Findings of Fact and Conclusions of Law (Doc. 225), FOF ¶ 153, COL ¶ 64.

the Court to calculate a civil penalty or resolve any issues pertaining to how such a penalty should be calculated.

## CONCLUSION

TCEQ's investigative determinations that the opacity events at issue in this case satisfy the affirmative-defense criteria in 30 Tex. Admin. Code § 101.22 are entitled to deference from this Court.  The portion of Sierra Club's claim challenging excess opacity during MSS activities is rendered moot by Luminant's pending application to incorporate the MSS provisions of Permit No. 56445 as a minor revision to Big Brown's Title V permit.  And a proper application of the citizen-suit civil-penalty provisions in 42 U.S.C. §§ 7604 and 7413 demonstrates that the upper limit of an appropriate penalty case is less than 0.02% of the amount that Sierra Club requests in its proposed findings and conclusions.  Defendants respectfully ask the Court to decide the central legal issues in this case consistent with the principles and arguments described in this trial brief.

Dated: February 21, 2014

Respectfully submitted,

_/s/ Mike Raiff_____
Counsel for Defendants

**Counsel for Defendants Energy Future Holdings
Corp. and Luminant Generation Company LLC:**

**Charles D. Olson**
Texas State Bar No. 15273200
**Michael W. Dixon**
Texas State Bar No. 05912100
Haley & Olson PC
510 North Valley Mills Drive, Suite 600
Waco, Texas 76710-6078
Phone: (254) 776-3336
Fax: (254) 776-6823
Email: colson@haleyolson.com
         mdixon@haleyolson.com

**Daniel J. Kelly**
Texas State Bar No. 24041229
Associate General Counsel
Energy Future Holdings Corp.
1601 Bryan Street, 43rd Floor
Dallas, Texas 75201
Phone: (214) 812-7182
Fax: (214) 812-6075
Email:
dan.kelly@energyfutureholdings.com

**William B. Dawson**
Texas State Bar No. 05606300
**Michael L. Raiff**
Texas State Bar No. 00784803
**Russell H. Falconer**
Texas State Bar No. 24069695
Gibson, Dunn & Crutcher LLP
2100 McKinney Avenue
Suite 1100
Dallas, Texas  75201-6912
Phone: (214) 698-3100
Fax: (214) 571-2900
Email: wdawson@gibsondunn.com

**P. Stephen Gidiere III**
Texas State Bar No. 24077984
**Thomas L. Casey, III**
Balch & Bingham LLP
1901 Sixth Avenue North, Suite 1500
Birmingham, Alabama 35203
Phone: (205) 251-8100
Fax: (205) 488-5694
Email: sgidiere@balch.com
         tcasey@balch.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on February 21, 2014, via CM/ECF, on all counsel of record.


<u>   */s/ Mike Raiff*                </u>
Counsel for Defendants